THE LAW OFFICES OF
# VINCENT J. MARTINELLI
ATTORNEY AND COUNSELOR AT LAW

*Executive Suites at The Park*
900 SOUTH AVENUE – 3rd FLOOR
STATEN ISLAND, NY 10314
TELEPHONE: (718) 667-0500
VJMLAW@si.rr.com

ADMITTED IN NEW YORK
AND NEW JERSEY

October 7, 2020

The Honorable I. Leo Glasser
United States Senior District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: <u>United States v. Vito Benjamin Bifalco</u>**
Criminal Docket No. 19-CR-444 (ILG)

Dear Judge Glasser:

Please accept this letter as a sentence memorandum on behalf of Mr. Benjamin Bifalco, currently scheduled to be sentenced on October 22, 2020 at 11AM.[1]

Mr. Bifalco pled guilty on February 20, 2020 and an original sentence date was ordered for July 16, 2020. However, because of the circumstances surrounding the COVID-19 national pandemic and Mr. Bifalco's request for an in-person hearing, the matter was adjourned until the present date. By and through this sentence memorandum, and any oral arguments made at his sentence hearing, I respectfully submit that a sentence of 1-year of probation is sufficient but not greater than necessary to satisfy all of the sentencing objectives of 18 USC § 3553(a)(1-7).

## BACKGROUND

On October 3, 2019 Mr. Bifalco was arrested pursuant to a 1-count Indictment alleging a violation of 18 USC 224(a), Attempted Sports Bribery. He was released on a

---

[1] Although this matter has been delayed since July due to COVID because Mr. Bifalco has requested an in-person hearing, at this point he also wishes not to unnecessarily delay the administration of justice. For that reason and for personal reasons of wanting closure, we are willing to voluntarily accept the Court's guidance as to how to proceed – either by in-person appearance, or by video conference, or by teleconference.

$200,000 secured bond and has been compliant with all Pre-Trial Services conditions.

On February 20, 2020, Mr. Bifalco pled guilty to the Indictment. A Presentence Investigation Report was delivered to me on May 19, 2020 and the defendant made certain objections to that report on June 2, 2020, ECF No. 22. To date, I have not received any addendum or final report addressing the objections.

## DISCUSSION

**I.**     **Legal Standard**

As the Supreme Court said in Pepper v. United States, 131 S.Ct. 1229 (2011), the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Id., 131 S.Ct. At 1240 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)). That process is embodied in the advisory sentencing system instituted by the Supreme Court's decision in United States v. Booker, 125 U.S. 738 (2005), which "breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the Section 3553(a) factors to the criminal defendants that come before them." United States v. Jones, 531 F.3d 163, 170 (2d Cir. 2008) (district court must make an "individualized assessment" of the sentencing warranted by 3553(a) "based on the facts presented" and "may not presume that the Guidelines range is reasonable"). The deference granted a district court's determination springs from its "singular advantage of actual and extensive sentencing experience," as well as its familiarity with the individual case and the individual defendant before it." Id. at 170.

Consistent with the principle of individualized sentencing is the wide discretion afforded the sentencing judge "in the sources and types of evidence used to assist in determining the kind and extent of punishment to be imposed", in particular, "the fullest information possible concerning the defendant's life and characteristics". *Pepper*, 131 S.Ct. At 1240 ("sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant"). Indeed, as *Pepper* points out, this principle is codified in 18 U.S.C. 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). Pepper v. United States, 131 S.Ct. 1229, 1242 (2011).

In United States v. Booker, 543 U.S. 220 (2005) the Supreme Court rendered the Sentencing Guidelines "effectively advisory". *Booker*, 543 U.S. at 245. Post-*Booker*, as the Second Circuit observed, [i]t is now ... emphatically clear that the Guidelines are guidelines - that is, they are truly advisory. *Cavera*, 550 F.3d at189.

As a procedural matter, district courts "must treat the Guidelines as the starting point and the initial benchmark- in calculating a sentence. Kimbrough v. United States, 552 U.S. 85, 108 (2007) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)).

However, sentencing courts may not presume that a Guidelines sentence is reasonable. See Nelson v. United States, 129 S.Ct. 890, 891-92 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable" [emphasis in original]); see also *Cavera*, 550 F.3d at 189 ("district court may not presume that a Guidelines sentence is reasonable"). Additionally, the Guidelines may not be assigned any presumptive weight over the other factors set forth in § 3553(a). United States v. Fierkhoglyad. 516 F.3d 122, 131 (2d Cir. 2008).

*Gall*, *Kimbrough*, and *Nelson* have effectively restored the district courts' broad sentencing discretion by permitting them to impose a sentence after considering all the USSG § 3553(a) factors, with the Guidelines being only one such consideration. United States v. Jones, 531 F.3d 163, 173-74 (2d Cir. 2008). Adhering to *Booker* and *Jones*. Section 3553(a) requires this Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in § 3553(a)(2).

All of these factors favor a probation sentence for Mr. Bifalco.

## II. Analysis

A sentence of probation, would be sufficient but not greater than necessary to satisfy the statutory mandates of 18 USC § 3553(a)(1-7), as follows.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The Nature and Circumstance of the Offense

For the most part, subject to the objections made in my letter dated June 2, 2020 and filed with the Court under ECF No. 22, Mr. Bifalco does not dispute the fact pattern laid out in paragraphs 3 – 8 of the PSR (Offense Conduct).

In short, approximately only four days before a college basketball game was to be played on December 16, 2018, Mr. Bifalco engaged in merely three different telephone conversations with Joseph Amato, Jr., in each of them Mr. Bifalco was bragging about Mr. Bifalco's ability to fix a basketball game at a school he attended. During the final conversation, however on the day of the game, he directly expressed *doubt* about this scheme to Mr. Amato Jr. The PSR, at Paragraph 7, when it recites certain portions of the conversation with Amato, Jr., leaves out pertinent aspects of the conversation that expresses doubt and that the scheme was actually in place. Specifically, the conversation from Bifalco to Amato Jr. state that *"the only problem ... and hes like yo if everything doesn't go according to plan hes like we'll give you some of the money back"*.[2] As a result of *that* final conversation, Amato, Jr. even immediately re-iterated the doubt about Mr. Bifalco's abilities to fix the game to a third party.

---

[2] Mr. Bifalco was apparently telling Amato Jr. that the player he was purportedly dealing with was saying it *might not* happen. In other words, clearly, Bifalco was "hedging" with Amato Jr. about the player actually doing what Bifalco was bragging about.

But as we all know, actions speak louder than words and sometimes words can be hollow. No wager was ever made on the game[3]. No money was ever given to any player.[4] Finally, the game did <u>not</u> cover the spread as the attempted bribery would have intended for it to be covered.

Any logical analysis of the facts can also lead to a *different* conclusion about the Mr. Bifalco's actions, other than that he *only* attempted to commit sports bribery. Any fair analysis could also lead to the conclusion that he was *also* attempting to induce Mr. Amato, Jr. to bet $50,000 on the game, believing that the game would be a 'winning bet", anyway, regardless of whether the bribery was in place or never in place and that they would profit from the winning bet, regardless of the scheme or not. In other words, because Bifalco had discussed it with one of the players that week, that player *might* make it happen for him, or might not; but that regardless, they would win the bet in the ordinary course, anyway. Thus, amplifying a specific reason for his exaggerated comments to Amato, Jr. – i.e., in order to induce him to wager, regardless of the scheme.

Actions speak louder than words in this instance. Thus, I respectfully submit to Your Honor that, even though Mr. Bifalco researched points spreads on internet gambling sites and spoke to a player about not scoring enough points to meet the spread and even called the internet site on the day of the game to "check the line", he nonetheless thought that the team would lose by a certain amount of points, anyway, and the bet would "cover" anyway. So r*egardless* of whether the player "shaved points" or not (and induced two others to shave points), they would all win money in the ordinary course. For that, he is clearly guilty of the attempt – as half-hearted and hair-brained as it was. But he never truly engaged in a typical "point shaving" scheme as we have all come to know over the years and in popular culture in that money was never wagered.

To amplify this point in a different way, in twenty-four (24) years of federal practice having participated in approximately sixty (60) federal criminal cases, I believe that this is the first case that I have ever defended with a Final Adjusted Offense Level of 8, in Zone A with a guidelines range of 0 - 6 months.

<u>The History and Characteristics of the Defendant</u>

Mr. Bifalco stands before this Court at 25-years of age having never been convicted of any crime. He was convicted at the age of 19 of Driving While Impaired, a NYS violation offense under the Vehicle and Traffic Law. His father died when his mother was 6 months pregnant with him and 3 months before his birth. His maternal grandfather, Vito Fossella, Sr., helped raise him. At the time of the offense, Mr. Bifalco

---

[3] The government issued a *Brady Letter*, dated December 9, 2019, stating that the government was unable to identify any *actual* bets that Mr. Bifalco had purportedly placed, as he had bragged about so much in his phone calls to Amato, Jr.

[4] The government's *Brady Letter* also confirmed that two of the three players denied the scheme in its entirety, and that the third admitted discussing it but denied receiving any money. The letter goes on to state that Bifalco "claimed" to give money to the players.

was only a senior in college.

Benjamin's father died of natural causes at 39-years of age while his mother was pregnant with Benjamin. As Veronica Bifalco, Benjamin's mother, writes:

> *When I was pregnant with him, his brother was 4 years old, and I lost my husband at 39 years of age.*
>
> *We will never forget when the FBI came to our house on October 3, 2019, and the fear I saw in my son's eyes will never be forgotten. Since then it has been an emotional roller coaster and financial struggles, even with the case looming over his head he continued to devote his time to study for his LSAT's and continue to fulfill his ambition to become a lawyer. With this case still open and the Coronavirus pandemic, employers do not want to hire him even though he was so eager to finally start his career. He had a good job that he was very proud of and had lost it because of his actions, which he regrets every day since then. This misstep in his life was such a learning experience but he will learn from his mistakes and move forward like he has so many times before. Even during this time of the unknown and this case is determined by you, he continues to network and secure some clients so he is ready to start his new career in business while he studies for the Law School Admission Test. The vision he seeks comes from perseverance, dedication, and hard work. However, when this happened, everything changed again and there's not a day that goes by where he doesn't say "I made a mistake."*

Benjamin comes from a large family and his mother's seven siblings and parents, who all live nearby, helped raise him when Veronica needed the help. As his maternal aunt Elizabeth Egan writes:

> *It gives me great peace knowing Benjamin is living home with his mother who has uncontrolled diabetes and is able to be there for her when she needs assistance with medication since her sugar level can plummet or skyrocket without notice and be there for her when she needs anything else she is unable to do secondary to her other medical conditions. Then, when I was recently diagnosed with Non-Hodgkin's Lymphoma, he was devastated and wanted to jump in his car to come and see me to make sure I was ok but was unable due to this pending case. He has a special relationship with my parents, his grandparent s, where you can find him there in the middle of the afternoon just visiting with them and helping when needed. He could always make them laugh whenever they are down, he just has that personality.*
>
> *Recently, my 80 year old mother was diagnosed with COVID 19 and she really wasn't well and you could see how concerned he was and he was one that could motivate her to get up and out of bed and start to recover.*

> *Benjamin loves to be with people, whether it be with his cousins, his grandparents, and many times you could find him playing with some older gentlemen in the neighborhood playing on their bocce league. He is able to brighten many peoples day with his lovely smile and jokes, and laughter sometimes is the best medicine.*
>
> *Now Benjamin is trying to move forward in his life while studying for the LSAT's and trying to continue to improve his life, it is been tough for him to sit back and wait to apply what he has learned since the coronavirus has limited him from excelling and getting his career started in what he has wanted to do for years. I know this portion of his life is not his finest moment but he has great potential to be an exceptional gentleman in his new lease on life. I would love to see him put this portion of his life behind him. He has learned a very important lesson but I believe with getting a fresh start there is nothing Benjamin can't do, he just needs the chance.*

Finally, Benjamin has many supporters and close life associates who know him best, as a dear family friend Dianne M. Powers, writes:

> *I have known Benjamin and his family for many years. I have watched him grow and volunteer for fund raising for Juvenile Diabetes and to do the JDRF Walk from the time he was very young for a total of 15 years. I also remember him volunteering at political campaigns along side my late husband and I. My most recent opportunity to see him work hard with accomplishment was his experience at Wagner College we spoke many times about his future plans. I admired his work ethic to maintain his GPA of 3.25 and graduate with a BS in Finance and a Minor in Government and Politics. It was also my pleasure to shake his hand when he received his Diploma at Commencement at Wagner College.*
>
> *I know this present circumstance in his life is a serious matter. I believe Benjamin is very sorry about what he did. Given the opportunity I believe that he will learn from it but I think he can move forward by helping in the community. I am a strong believer in volunteering and feel he has that ability to help others. I see him continuing his education volunteering and appreciating being given a chance.*
>
> *Judge Glasser I ask you to please consider the good things that Benjamin has accomplished and is capable of accomplishing in the future. I ask from heart please allow him this opportunity.*
>
> *I truly believe he will move forward in the right direction and ask please allow this to happen without a jail sentence.*

These are only three of many examples. Please s*ee* the entirety of the sixteen (16) letters attesting to Mr. Bifalco's life and good character, attached as Exhibit A for the

Court's convenience.

### B. The Need for the Sentence Imposed

The Court must consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

A term of probation would easily reflect the seriousness of this offense, as well as promote respect for the law and provide just punishment, adequate deterrence, and protection from the public from the further of the defendant's crime. As an initial matter, a sentence of probation will leave Mr. Bifalco with a federal criminal felony record that will haunt him his whole life, potentially more than it would other similarly-situated defendants. And a probation sentence would promote significant respect for the law and obvious just punishment. Furthermore, the fact that this case made certain national news, being on the *front* cover of the NY Post and spoken about on ESPN, provides a tremendous deterrent both individually (because of the harm to Mr. Bifalco's reputation) and nationally (as the public can *only* see from that previous coverage how seriously this was treated). The public is not at danger from Mr. Bifalco further in any way as he has shown to the Court that he has valuable life-goals that he wishes to engage in should he not be incarcerated. Finally, as for the need for appropriate educational/vocational training, medical treatment, or correctional treatment, an incarceration sentence would only serve negatively, here, as it would in essence ruin a life whereby other forms of sentence can certainly improve a life. As Paragraph No. 52 of the PSR properly states:

> **As a result of a felony conviction, defendants face a potentially broad range of collateral consequences. Numerous federal and state laws place various restrictions on defendants, many of which attach automatically upon conviction. Some of these collateral consequences include the denial of government benefits, ineligibility for public housing, suspension of student loans, revocation or suspension of driver's licenses, and the inability to enlist in the military, or to serve on a jury or to vote. The potential collateral consequences of a felony conviction are numerous and circumstance-specific.**

As the Court is already aware, Mr. Bifalco has taken the LSAT test and is interested in attending law school and but not for the COVID-19 national emergency, he would already be enrolled. Additionally, he was immediately fired upon his arrest from his previous employment working as a low-level staffer for a political candidate.

### C. The Kinds of Sentences Available

Mr. Bifalco agrees with the PSR at ¶¶ 42, 44, 46 and 48, which correctly analyzes all available statutory maximums. There is no statutory minimum for any term of custody , term of supervised release or fine amount and the statutory minimum for any term of probation is one (1) year.[5] A special assessment of $100 is mandatory. 18 USC § 3013.

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

Mr. Bifalco agrees with the Guidelines range analysis listed in the PSR at ¶¶ 10 - 14 and 43, 45, 47 and 49. Incarceration is properly reflected at 0 to 6 months in Zone A of the Guidelines Sentencing Table; a supervised release term of 1 to 3 years; a probation term of 1 to 5 years; and a fine of between $2,000 and $20,000. Regarding any term of probation, since the guideline rang is in Zone A of the Sentencing Table, a condition requiring a period of community confinement, home detention, or intermittent confinement is <u>not</u> required. USSG § 5B1.1, comment n.(1)(a).

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement issued by the Sentencing Commission." 18 USC § 3553(a)(5).

This factor is not relevant to Mr. Bifalco's sentencing.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth§ 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

I know of no other similar cases in this district and cannot make any representations one way or the other. However, I would note that of the three purported college players who Mr. Bifalco spoke about in recorded conversations with another individual[6], "the government has spoken with one or more of the players", and "[o]ne or more of those players advised law enforcement that Bifalco in fact had *offered* one or more of them money to affect the outcome of a basketball game … but denied ever *receiving* any money from Bifalco" (emphasis as in original). *See* the government's Brady Letter on the matter, dated December 9, 2019, attached as Exhibit "B". To date, none of the players have been arrested in this matter.

---

[5] A fine, restitution or community service must be imposed as a condition of probation, unless extraordinary circumstances exist. 18 USC § 3563(a)(2).

[6] The other individual's telephone conversations were originally recorded pursuant to an eavesdropping warrant for probable cause issues unrelated to this matter.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

This factor is not relevant to Mr. Bifalco's sentencing.

### CONCLUSION

I respectfully submit that a sentence of probation and a $100 mandatory special assessment is appropriate and comports with the dictates of Title 18, Section 3553.

This sentence is consistent with and is sufficient but no greater than necessary to accomplish the purposes of section 3553(a)(2).

Thanking you in advance for your time and consideration.

Very truly yours,

*Vincent Martinelli*

Vincent J. Martinelli

CC: All Parties via ECF